UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                              CASE NO. 04-12949

**ANTHONY JOSEPH CATALANOTTO**                SECTION "B"
**and VICTORIA ANN CATALANOTTO**
    *Debtors*                                                CHAPTER 7
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**IMPERIAL TRADING CO., INC.**
    *Plaintiff*

**VERSUS**                                                          ADVERSARY
                                                                    NO. 04-01112
**JOSEPH CATALANOTTO**
    *Defendant*

## MEMORANDUM OPINION

This matter came before the court on November 27, 2006 as a trial on the complaint of Imperial Trading Company, Inc. ("Imperial"), seeking the court's determination whether the debtor was indebted to Imperial, and whether such debt was dischargeable under various subsections of 11 U.S.C. § 523. For the reasons set forth below, the court finds that any debt that might be owed to Imperial is dischargeable. Because the debt is dischargeable, the court need not determine whether a debt exists or the amount of that debt.

    **I.  Background Facts**

The debtors, Anthony and Victoria Catalanotto, filed for Chapter 7 bankruptcy relief on April 21, 2004. Until 1998, Mr. Catalanotto was the president of Vend Rite,

1

later named Riverbend Vending.  On July 24, 1998 Imperial, as the purchaser, signed an "Agreement to Sell" with Mr. Catalanotto, his son, Vincent Catalanotto (d/b/a Vend Rite), and Riverbend Vending, Ltd. (collectively "the sellers") to purchase the sellers' cigarette, tobacco, and vending machine business.  Imperial purchased the business for $775,000 with payments to include an initial deposit of $25,000, a payment of $525,000 at the closing, and finally a consulting fee of $225,000 to be paid over 24 months to Mr. Catalanotto and Riverbend Vending.  The sellers guaranteed there would be, as of the date of the sale, existing inventory of at least $18,600 in soft drinks and food and at least $64,690 in cigarettes.  The agreement also stated that the sellers warranted that in Orleans and Jefferson Parishes there existed two different types of customer location (snacks, candy, and soft drink routes and cigarette routes) totaling 214 locations.

In the agreement, the sellers represented that the annual sales for the previous 12 month period exceeded $1,644,000, exclusive of sales taxes and manufacturer price increases, and guaranteed that same amount for the 12 months following the sale.  The agreement also provides that Imperial may withhold from the purchase payments any deficiency should the sales not meet that guarantee.[1]

Mr. Catalanotto's representation that Vend Rite earned $1,664,000 in the 12 months prior to the sale was based on calculations relating to the month prior to the sale, rather than the actual sales over the previous 12 months.[2]  In fact, Vend Rite's bank

---

[1] Exhibit 21.
[2] Trial Transcript p.37 line 16- p.38 line 10.

2

records reflect total deposits of $1,046.618.38 in the 12 months prior to the sale to Imperial.[3] In the 12 months following the sale to Imperial, Vend Rite's sales totaled $1,136,187.82 after taxes and manufacturer's price increases.[4] The difference between this amount and the amount of actual sales guaranteed in the Agreement to Sell represents a deficiency of $527,812.18.

The parties stipulate that $93,750 is still owed by Imperial for the services under the consulting agreement. The parties disagree, however, as to whether there are damages owed by the debtor under the Agreement to Sell and whether those damages are nondischargeable.

Imperial contends that it relied to its detriment upon the warranties and guarantees about Vend Rite's past and future earnings that Mr. Catalanotto provided in the Agreement to Sell. Imperial also alleges that several of the accounts that were to be transferred to Imperial were inactive accounts. Imperial argues that the guarantees given were to induce Imperial to enter into the sale of the business, and were made with reckless disregard for the truth. Imperial initiated an adversary proceeding seeking a declaration of non-dischargability under 11 U.S.C. §523 that money owed by the debtors arising from the sale of Vend Rite to Imperial was procured through fraud. Imperial asserts that the debt is nondischargeable because of fraudulent representations by Mr.

---

[3] Trial Transcript p. 35 lines 15-20.
[4] Exhibit 24.

3

Catalanotto and alleges causes of action under §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)(6) of the Bankruptcy Code.

The debtor asserts that the representations made in the agreement were only his "predictions" of future sales and that he believed those predictions were true at the time they were made. As such, he contends that there was no intent to deceive Imperial. The debtor also argues that Imperial did not reasonably rely on the debtor's representation as it paid the debtor despite its inability to verify the debtor's sales projections and used the guarantee clause as assurance for future sales so that it did not have to rely on or verify Mr. Catalanotto's representations.

The debtor also argues that Imperial did not actually sustain a loss as a result of the representations as Imperial earned more in its year after purchase than it paid for the business. The debtor further contends that any deficiency in earnings Imperial experienced may be due to its own fault as it lost accounts as a result of its poor service.[5]

**II. Law and Analysis**

   **A. The Agreement to Sell is a valid contract despite the parties' failure to perfect an Act of Sale after execution of the Agreement.**

The debtor argues that the agreement was not a valid contract because the parties intended "to perfect an Act of Sale no later than July 31, 1998 if all conditions to such

---

[5] The Agreement to Sell provides that the sellers will not be responsible for any sales deficiency that is a result of lost sales because of poor service by the purchaser. Exhibit 21, §III. 5.

sale set forth [in the Agreement to Sell were] met" and no such Act of Sale was written.[6] Under Louisiana law, where there has been a meeting of the minds on all essential terms of a contract, a binding agreement has been made even if the parties intend to execute a formal agreement unless the parties explicitly intend to be bound only when the formal agreement is executed.[7] Because no further act of the parties was required after the Agreement to Sell, and because the parties fulfilled most of their duties under the contract with no intention to be bound only after a formal Act of Sale, the Agreement constitutes a contract of sale.[8]

The debtor's late in the game argument that there was no act of sale falls on deaf ears. The sellers cannot accept almost all of the payments due and then complain there was no act of sale.[9] It is of no moment that there was never a formal act of sale. The rights and obligations of both parties are set forth in the Agreement to Sell and most of them have been performed.

---

[6] Exhibit 21, §II.

[7] *Newport Ltd. V. Sears, Roebuck & Co.*, 6 F.3d 1058, 1065 (5th Cir. 1993)(citing *Mermelstein v. Schwab,* 64 So.2d 37, 38 (La.Ct.App. 1953); *Chevron U.S.A., Inc. v. Martin Exploration Co.,* 447 So.2d 469 (La.1984)).

[8] *See id.*

[9] The evidence shows the debtor has been paid all of the $550,000 initial purchase price and $131,250 of the $225,000 consulting fee. The remaining $93,750 that remains to be paid on the consulting fee has been withheld by Imperial on the grounds that the debtor now owes Imperial for failure of guarantee.

**B. The Debt is Dischargeable.**

Imperial alleges in its complaint that the amount owed to it by Mr. Catalanotto is non-dischargeable for four reasons: the debt was obtained by fraudulent representations or pretenses under §523(a)(2)(A), the debt was obtained by use of a materially false financial statement in writing under §523(a)(2)(B), for fraud pursuant to § 523(a)(4), and finally, because Mr. Catalanotto's actions constituted malicious or willful injury to Imperial's property under §523(a)(6). Imperial, as the creditor objecting to the dischargeability of a debt under any of the §523(a) dischargeability exceptions, has the burden of proving its case by a preponderance of the evidence.[10]

**1. Fraud under 523(a)(2)(A).**

Debts obtained by "false pretenses, a false representation, or actual fraud" are nondischargeable.[11] "When defining the elements of nondischargeability, the Fifth Circuit has distinguished between actual fraud on one hand and false pretenses and false representations on the other."[12] To prove false pretenses the creditor must show there has been "1) a knowing and fraudulent falsehood, 2) describing past or current facts, 3) that was relied upon by the other party."[13] To prove actual fraud, the creditor must show that:

1) the debtor made representations;

---

[10] *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

[11] 11 U.S.C. § 523(a)(2)(A).

[12] *In re Quinlivan*, 347 B.R. 811, 820 (Bankr. E.D.La 2006) (citing *RecoverEdge v. Pentecost,* 44 F.3d 1284, 1292 (5th Cir. 1995); *In re Allison,* 960 F.2d 481, 484-85 (5th Cir. 1992); *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991)).

[13] *RecoverEdge*, 44 F.3d at 1293.

  2) at the time they were made the debtor knew they were false;
  3) the debtor made the representations with the intention and purpose to deceive the creditor;
  4) that the creditor relied on such representations; and
  5) that the creditor sustained losses as a proximate result of the representations."[14]

The standard of reliance for a finding of nondischargeability under 523(a)(2)(A) is justifiable, rather than reasonable, reliance.[15]

  Imperial failed to carry its burden of proof as to at least three, and maybe four, of these requirements. First, it is not totally clear whether the representations that Imperial relied on are the total sales in the year preceding the sale or the guarantee of the dollar amount of the sales in the year following the agreement. Assuming it is the one year period preceding the agreement, Imperial has satisfied the first condition to prove actual fraud.[16]

  The evidence advanced by Imperial as to conditions two and three is, however, far from sufficient. There is not enough proof that Mr. Catalanotto knew at the time that the total sales figure of $1,644,000 was false and that he made this representation with the intention and purpose of deceiving Imperial. Although Mr. Catalanotto was somewhat vague in several aspects of his testimony and had an occasional, convenient loss of

---

[14] *Id.* (quoting *In re Roeder,* 61 B.R. 179 (Bankr.W.D.Ky. 1986); *see also In re Bercier,* 934 F.2d at 692.

[15] *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

[16] If Imperial is relying on the guarantee of future sales, that is not sufficient to qualify as a representation of past or current facts as required by *RecoverEdge LP v. Pentacost,* 44 F.3d 1284, 1292-93 (5th Cir. 1995). *See also In re Allison* 960 F.2d 481, 483 (5th Cir. 1992)).

memory in other aspects, his testimony that the $1,644,000 figure was taken from the debtor's computer records and that the computer records were given to Imperial is clear and uncontroverted.

As to the fourth requirement – that Imperial relied on the false representations – the evidence by Imperial is also lacking. Imperial had to show that it actually and justifiably relied on the representations that Mr. Catalanotto made in the Agreement to Sell about Vend Rite's prior year's earnings. William Gilbert Stroud, Senior Vice President and former CFO of Imperial, testified that Mr. Catalanotto did not provide tax returns, detailed sales records of each customer, or financial statements to verify Vend Rite's earnings. Additionally, Mr. Stroud testified that Mr. Catalanotto arrived at the $1,644,000 figure based on his review of route records and that Imperial was aware that "[t]his would be what these accounts would generate, not necessarily what has gone into [Vend Rite's] bank account or reflected in their books."[17]

When asked, Mr. Stroud first stated that he relied on Mr. Catalanotto's representations, but he later testified that "[Imperial] didn't have any documentation that [it] could rely on in doing this, the only way that [it] could do this deal [was] to make sure the guarantee was severe enough that nobody would do this deal unless they know that's the numbers they were going to come up with."[18] Also, under the terms of the consulting agreement of July 31, 1998 providing for $225,000 to be paid in monthly installments of

---

[17] Trial Transcript p. 62 line 23-p. 63 line 16.
[18] Trial Transcript p. 64 lines 6-21.

$9,375, Imperial could terminate the agreement on 30 day notice and reduce its obligation to pay the entire $225,000 by any amount that the sales fell short of the guaranteed amount of $1,644,000.[19]

Actual reliance is not shown when the creditor relied on the expectation of damages rather than the debtor's representations.[20] "The maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held liable in damages for its falsity."[21] Imperial included the guarantee in the Agreement to Sell so that it would not have to rely on Mr. Catalanotto's representations. Imperial failed to show that it would not have purchased Vend Rite had it known the actual amount of revenue Vend Rite generated in the year prior to its sale. Imperial failed to carry the burden of proving the necessary elements for an exception to discharge under § 523(a)(2)(A).

### 2. False Financial Statement under Section 523(a)(2)(B).

Section 523(a)(2)(B) excepts from discharge a debt:

For money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
(B) use of a statement in writing--

---

[19] Exhibit 22, ¶3 incorporating §III.5 of the Agreement to Sell, Exhibit 21. Pursuant to those provisions, Imperial withheld $93,750 from the payments to have been made to Mr. Catalanotto under the consulting agreement. *See* Exhibit 34.

[20] *See, e.g., In re Alexander*, 212 B.R. 993 (Bkrtcy.M.D.Ala. 1997)(no actual reliance when merchants relied on the expectation of reimbursement for worthless checks from Checkcare, a debt transferee that reimburses participating companies for worthless checks, rather than on the checks themselves).

[21] *Restatement (Second) of Torts* § 548 (1976).

>    (i) that is materially false;
>    (ii) respecting the debtor's or an insider's financial condition;
>    (iii) on which the creditor to whom the debtor is liable for such money property, services, or credit reasonable relied; and
>    (iv) that the debtor caused to be made or published with intent to deceive.

This provision requires that the creditor first show that there is a false statement in writing respecting the debtor's financial condition. Although the court is unclear as to exactly what document Imperial is claiming constitutes the writing wherein the false statement was made, the only document introduced as evidence that would seem to qualify is the Agreement to Sell. In determining whether a statement relates to a debtor's financial condition, courts have found that the term is not limited to formal financial statements.[22] Although the court is not certain that the Agreement to Sell does constitute a statement in writing respecting the debtor's financial condition,[23] in giving the benefit of the doubt to Imperial on this point, the court notes that § 523(a)(2)(B) also explicitly requires that the creditor show that it reasonably relied on the statement.[24] Materiality and reliance should be considered together, as "[e]ven a material lie may be disregarded when the victim is not actually taken in."[25]

---

[22] *In re Bogdanovich*, 292 F.3d 104, 112 (2nd Cir. 2002).

[23] There is nothing in the Agreement to Sell respecting the debtor's financial condition. The agreement can be interpreted, however, as a statement of the financial condition of Vend Rite, which under § 101(31)(A) is an "insider" and thus within the purview of § 523(a)(2)(B)(ii).

[24] *In re Allison,* 960 F.2d 481 (5th Cir. 1992).

[25] *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995).

>If the investor possesses information sufficient to call the representation into question, he *cannot* claim later that he relied on or was deceived by the lie. This is *not* because he has a duty to investigate lies or prevent intentional torts, though; it is, rather, because the false statement is *not material* under the circumstances.[26]

Imperial failed to show that it relied on Mr. Catalanotto's representations in the Agreement to Sell about Vend Rite's prior year's earnings. Mr. Stroud testified that he was aware the earnings stated in the Agreement to Sell were not documented, but instead were based on what Mr. Catalanotto expected Vend Rite could make in the future. Additionally, Imperial had reason to question these earnings when Mr. Catalanotto failed to provide tax returns, financial statements, or detailed accounting documents.[27] Further, Imperial took over Vend Rite's computers and had the ability to access information about Vend Rite's accounts and earnings. Imperial's doubt is evident in that it conditioned the purchase of Vend Rite on Mr. Catalanotto's guarantee and its right to deduct from, or cease payment of, the monthly sums due Mr. Catalanotto under the consulting agreement. By virtue of such a guarantee, Mr. Catalanotto's representations in the Agreement to Sell were not material to Imperial's entering into the contract. Thus, Imperial failed to prove by a preponderance of the evidence that it reasonably relied on the representations in the Agreement to Sell with respect to the financial condition of the debtor or Vend Rite.

---

[26] *In re Mercer,* 246 F.3d 391, 416 n.33 (5th Cir. 2001) (quoting *Mayer*, 51 F.3d at 676).

[27] It is these types of documents, had they been provided, that the court would assume could be looked to for misrepresentations of the debtor's financial condition. Because they were not available, Imperial could not possibly have relied on them in its purchase of the Vend Rite business from the debtor.

### 3.    Section 523(a)(4).

In its complaint Imperial makes a claim under § 523(a)(4), which excepts a debt from discharge, "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." This claim is not addressed by Imperial in its argument, and the court finds that at trial, no evidence was introduced that would support a claim under this section. The court therefore dismisses any claim under § 523(a)(4).

### 4.    Section 523(a)(6).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[28] Generally, this subsection is used to except from discharge claims related to torts and not to contracts.[29] The injury that Imperial complains it sustained is not of the type properly addressed under § 523(a)(6). "The classic case for application of the willful and malicious injury exception to discharge under 11 U.S.C.A. § 523(a)(6) seems to arise when the debtor intentionally injures a creditor, and the creditor seeks to make nondischargeable a judgment won in a state court tort action."[30] Cases involving injuries stemming from assault, the debtor's obligation to a former employee for sexual harassment, libel, fraudulent inducement of a patient to submit to surgery where the debtor represented himself to be a doctor, and injuries as a result of the debtor's drag racing, for example are

---

[28] 11 U.S.C. §523(a)(6).

[29] 4 Collier on Bankruptcy ¶ 523.12[1] at p. 523-92.2 (15th ed. rev. 2006).

[30] AMJUR Bankruptcy § 3656 (citations omitted).

typical of debts excepted from discharge under this subsection.[31] Although atypical, Imperial alleges that Mr. Catalanotto's misrepresentations as to the value of Vend Rite were willful and malicious and were made with the intent to cause Imperial to pay more for the business. Imperial presented no credible evidence to support the allegation. The court finds that the alleged increase in payment price does not rise to the level of an "injury" within the meaning of §523(a)(6).

Following the Supreme Court decision in *Kawaauhau v. Geiger*,[32] the Fifth Circuit set forth a two-pronged test to determine dischargeability under 523(a)(6).[33] First, an injury is "willful" where there is either an objective substantial certainty of harm or a subjective motive to cause harm."[34] Second, an injury is "malicious" if it is "an act done with the actual intent to cause injury."[35] The court finds that Mr. Catalanotto did not act willfully or maliciously within the meaning of § 523(a)(6) as interpreted by the Fifth Circuit. No subjective motive to cause harm was shown, nor was actual intent to cause injury. The elements required for the court to find a non-dischargeable debt under § 523(a)(6) were not proved by Imperial at the trial by a preponderance of the evidence.

---

[31] *Id.*; *See e.g. Kawaauhau v. Geiger* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (doctor's negligence in the amputation of a patient's leg as a result of medical malpractice did not satisfy the "willful and malicious" element); *In re Miller*, 156 F.3d 598 (5th Cir. 1998) (where the injury was the misappropriation of proprietary information and misuse of trade secrets).

[32] 523 U.S. 57 (1998).

[33] *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998).

[34] *Id.*; *see also In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005).

[35] *Keaty*, 397 F.3d at 270.

### C. Attorney's Fees

Although the debtor as defendant in this adversary seeks reasonable attorney's fees, in his memorandum, he cites no authority authorizing the court to deviate from the American Rule that usually does not allow fees to a prevailing defendant. If any such authority exists, an allowance of fees would be discretionary on the part of the court. The court exercises its discretion in this case to disallow the attorney's fees requested by the debtor.

### III. Conclusion

For the foregoing reasons, the court holds that Mr. Catalanotto did not incur any debt to Imperial by false pretenses, false representations, actual fraud, or a false financial statement. The court further finds that Mr. Catalanotto's representation about Vend Rite's past or future earnings did not constitute a willful and malicious injury. Therefore, the court holds that any debt owed by Mr. Catalanotto to Imperial is dischargeable.

New Orleans, Louisiana, April 12, 2007.

_J. A. Brown_
Jerry A. Brown
U.S. Bankruptcy Judge